Strafford,
March 4, 1941. } No. 3226.

STATE *v.* WALTER CHAPLINSKY.

*Frank R. Kenison,* Attorney-General, *Ernest R. D'Amours,* Assist-

ant Attorney General, and *John F. Beamis*, County Solicitor (*Mr. Kenison* orally), for the State.

*Hayden Covington* (of New York), *Alfred A. Albert* (of Massachusetts) and *Frank E. Blackburn* (*Mr. Covington* orally), for the defendant.

PAGE, J.   The statute involved is P. L., c. 378, s. 2, which reads thus: "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation."

The complaint is that Chaplinsky, being in the street at Rochester, addressed to the City Marshal these words: "You are a God damned racketeer" and "a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists." These words were testified to by several of the State's witnesses. The defendant admitted the words with the exception of the qualifying "God."

The section of the statute involved has two provisions. The first relates to words and names applied by one directly to another in a public place. The second refers to noises or exclamations, possibly not directed to the person derided, but with the intent expressed. The two provisions are distinct. One may stand separately from the other. Assuming, without holding, that the second were unconstitutional, the first could stand if constitutional. *Woolf* v. *Fuller*, 87 N. H. 64, 69; *Rosenblum* v. *Griffin*, 89 N. H. 314, 320. Since the present case arises solely under the first provision, there is no need to consider either the construction or the constitutionality of the second. We shall not do so.

The provision now involved has twice been construed by this court. Nearly fifty years ago there was a conviction under it, in a case where the defendant, in the street, addressed to one also in the street the words "You are a God damned blackmailer." The defendant attempted to justify by proving the statement to be true. Since the statute makes no distinction between truthful and untruthful utterances, it was held that the justification was inadmissible. Construing the statute, this court said that its "purpose was to preserve the public peace. The direct tendency of such conduct, like that of [criminal] libel (4 Bl. Com. 150, 151), is to provoke the person

against whom it is directed to acts of violence." *State* v. *Brown*, 68 N. H. 200. The decision seems to have assumed that the only intent required for conviction under the first part of the section was an intent to speak the words. In any event, that is the construction which we place upon the provision.

Again in 1900, the earlier construction was followed, and it was further held that the act applied where the words were addressed by one to another in a public highway, even though no third person was present to hear the words. *State* v. *McConnell*, 70 N. H. 294. The complaining witness, a woman, was called a bitch, with other obscene words not thought necessary to be printed in the reported decision. 209 Briefs and Cases, 521.

It thus appears that long before the words for which Chaplinsky was convicted, the construction of the provision was made plain, to the extent that no words were forbidden except such as have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed. This is not a case where, in advance of a judicial interpretation, the defendant could not be bound to understand what was intended by the statute. See *Lanzetta* v. *New Jersey*, 306 U. S. 451, 456.

Another point may be mentioned at once. The defendant asserts that the trial court improperly excluded evidence of, and comment on, the supposed provocation of Chaplinsky growing out of his prior treatment by the crowd. We think the ruling was correct.

The "provocative matter" was this. Chaplinsky was lawfully engaged, on the streets of Rochester, in the distribution of the literature of the sect known as Jehovah's Witnesses. Some of those on the streets apparently resented his activities. They may have thought them provocative. At least they complained to the City Marshal, who says he told them that Chaplinsky was lawfully engaged and that he must be left alone. At the same time the Marshal says he informed Chaplinsky that the crowd was getting restless and that he would better go slow. Some hours later, the crowd got out of hand and treated Chaplinsky with some violence. He was then led by policemen towards the police station, though apparently more for his protection than for arrest, since his arrest was definitely fixed only after he uttered the words charged, when the Marshal met him on the way. It may be remarked that nobody concerned, taking Chaplinsky at his word, used proper restraint on this occasion, but that fact, if true, could not be a defence of his own conduct.

At the moment the defendant uttered the words for which he was

convicted, he undoubtedly felt resentment because he had been roughly handled by the crowd. His resentment might well enough have extended to the police if they had failed to take any step reasonably within their power to control the crowd, or if they had failed to prosecute anybody who they had reasonable ground to believe had assailed him. But those facts, if true, would not have justified the offensive manner in which he sought to bring the Marshal to what Chaplinsky may have regarded as a sense of his duty. It was not useful or proper comment for bringing truth to light. Its plain tendency was to further breach of order, and it was itself a breach of the peace.

The excluded evidence related solely to Chaplinsky's recital of what he conceived was his mission to "preach the true facts of the situation of the Bible to the people," of "the Christian's permission," and of certain acts of the crowd that seem to have happened outside of the knowledge of the police. As to any possible provocation he had suffered while in the presence of the police, his testimony appears to have been admitted, though immaterial to the issue of his guilt. The court, in any event, was correct in excluding as immaterial the issues (1) whether the police had been neglectful prior to his offense, (2) whether the defendant had been assaulted by the crowd, and (3) whether, the defendant, in consequence, had been provoked to use the words with which he was charged. The defendant's argument as to this exclusion comes to this—that if he was provoked, the truth of his appellation of the Marshal could be established. The truth would be no justification. *State* v. *Brown, supra.*

The rule thus established is not severe. Chaplinsky could no more defend unlawful speech on the ground of provocation than could one of the street-crowd have defended a charge of calling Chaplinsky names on the ground that the name-caller had been incensed by Chaplinsky's teachings. The defendant was held to the same duties as those who disagreed with him or with whom he disagreed. The rules of fair conduct in public speech in the street apply indiscriminately to all—whether the speaker be a preacher, an official or a mere by-stander.

The defendant was not entitled to a directed verdict unless the statute is unconstitutional.

Upon the question of constitutionality, the defendant asserts infringement of the fundamental liberties of speech, press and worship. Since he did not print his words or circulate them in printed form, and since the words have no perceptible connection with wor-

ship or with freedom of religious belief or practice, we shall confine ourselves to the subject of free speech, though cognate rights may have illustrative effect in the course of this discussion.

The right to speak freely, whether in a street or elsewhere, is of primary importance. That is a principle whose general validity nobody denies, and nobody ought ever to deny. But the right may be limited in appropriate situations. The question is whether the limitation imposed by our statute is constitutionally permissible.

The fundamental basis of the constitutional rule is the necessity for full and free discussion of all subjects which affect ways of life, including religious, social and governmental questions. This is "essential to the very existence and perpetuity of free government." Cooley, Constitutional Limitations, (7th *ed.*), 596.

"No one can doubt the importance, in a free government, of a right to canvass the acts of public men and the tendency of public measures, to censure boldly the conduct of rulers, and to scrutinize closely the policy and plans of the government. This is the great security of a free government. If we would preserve it, public opinion must be enlightened; political vigilance must be inculcated; free, but not licentious discussion, must be encouraged. But the exercise of a right is essentially different from an abuse of it. The one is no legitimate inference from the other. Common-sense here promulgates the broad doctrine, *sic utere tuo, ut non alienum laedas;* so exercise your own freedom as not to infringe the rights of others, or the public peace and safety." Story, Constitution of the United States, *s.* 1888.

"Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama*, 310 U. S. 88, 102.

If a city officer is guilty of a wrong or a neglect, any person is free to comment, to the end that free government may be preserved. Peaceful and truthful discussion of matters of public interest cannot be penalized merely because others than the speaker may be persuaded of the truth of the criticism. "Abridgement of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion." *Thornhill* v. *Alabama, supra.*

The only competition for acceptance in that market of opinion to be found in this record is this: the defendant admittedly called

the Marshal a damned racketeer and Fascist, in exchange, as the defendant says, for the Marshal's calling him a damned bastard. Either appellation, applied directly to the other on the street, would clearly be a breach of the statute. Neither would rise above the level of name-calling. Neither party could expect the other to be persuaded by such language. Neither remark qualifies as peaceful and truthful discussion of matters of public interest. Each invited personal violence and disturbance of the peace, without any observable tendency to enable the by-standers to test the merits of the competitive ideas, if they were ideas. We can see no relationship of such utterances to that freedom of speech which is so acutely desirable if free institutions are to be preserved. Such face-to-face reviling is not remotely necessary in the debate of public questions. It is not argument. It has no persuasive power. Its only power is to inflame, to endanger that calm and useful consideration of public problems which is the protection of free government. Its tendency is to useless and dangerous disorder in which the object of free speech is lost to view.

That there are limitations to the right of even unabusive speech is well recognized. In time of war an argument against military service, at other times permissible, may be penalized because "the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck* v. *United States*, 249 U. S. 47, 52. The evil in that case was the obstruction to recruiting. Nor need the restriction be limited to evil intended, provided the evil be imminent. As Mr. Justice *Holmes* said, "It is only the present danger of immediate evil or an intent to bring it about that warrants Congress in setting a limit to the expression of opinion where private rights are not concerned." *Abrams* v. *United States*, 250 U. S. 616, 628. In another dissenting opinion, by Mr. Justice *Brandeis*, in which Mr. Justice *Holmes* joined, it was again declared that the exercise of free speech may be restricted where speech would "produce, or is intended to produce, a clear and imminent danger of some substantive evil which the State may constitutionally seek to prevent." *Whitney* v. *California*, 274 U. S. 357, 373.

In the case last cited the majority declared (at page 371) that it was not open to question "That a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to incite to crime, disturb

the public peace, or endanger the foundations of organized government and threaten its overthrow by unlawful means." See also *Gitlow* v. *New York*, 268 U. S. 652, 667.

In maintaining the guaranty of free speech, the authority of the State to enact laws to promote health, safety, morals and the general welfare is "necessarily admitted." The limits of this reserved authority must be "determined with appropriate regard to the particular subject of its exercise." And "the power of the State stops short of interference with what are deemed to be certain indispensable requirements of the liberty assured. ... Liberty of speech, and of the press, is also not an absolute right, and the State may punish its abuse." The statute must be tested by its operation and effect. And so an act is unconstitutional if it authorizes the suppression by injunction of the future publication of a newspaper found in the past to have printed scandalous matter, whether true or false. The fact that the peace may be disturbed by the continuance of the publication does not warrant complete suppression or censorship of a newspaper which criticizes public officials in terms likely to injure their reputation. *Near* v. *Minnesota*, 283 U. S. 697, 707, 708.

Upon similar grounds, a tax upon the advertisements in papers having a circulation of more than 20,000 a week is unconstitutional as a previous restraint. *Grosjean* v. *Company*, 297 U. S. 233. The statutes in these two newspaper cases did not punish abuses; they entirely suppressed, or tended to suppress, the right of press. Nobody can claim that the statute under which Chaplinsky was convicted does more than punish the abuse of free speech. It does not suppress the right of speech, even in particular places. It is not an indispensable requirement of right that one criticizing a person should be permitted to address him directly in a public place with offensive, derisive or annoying words likely to precipitate a breach of the peace. Charges of official wrong or neglect may be expressed by way of argument to the public in the streets with no more than minor danger of disturbance, and that is enough to meet the requirements.

"These rights may be abused by using speech or press or assembly in order to incite to violence and crime. The people through their legislatures may protect themselves against that abuse. . . . The rights themselves must not be curtailed." Only so can desirable changes be made by peaceful means, which is the purpose of the right of free speech. *DeJonge* v. *Oregon*, 299 U. S. 353, 364, 365. "The limitation upon individual liberty must have appropriate relation to the safety of the state." *Herndon* v. *Lowry*, 301 U. S. 242, 258.

318

Consequently an act prohibiting the distribution of literature in the streets without regard to involvement in disorderly conduct is too sweeping to be valid. *Lovell* v. *Griffin*, 303 U. S. 444, 451. It strikes at the "very foundation of the freedom of the press by subjecting it to license and censorship." Our statute aims merely to punish the abuse of right (in this case disorderly conduct) and subjects the speaker to no restraint of indispensable right.

Legislation aimed at conduct which impedes free use of the streets may be sustained provided it does not abridge the liberty of one rightfully in the streets to impart information without interfering with such use. "Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion." *Schneider* v. *State*, 308 U. S. 147, 161. Our statute prohibits conduct which has no necessary relationship to those freedoms.

The right of speech, therefore, "is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." The statute making the limitation must meet the test named. And so, if the statute provides for no speech without a permit, and the issuance of the permit depends upon the mere opinion of the licensing official that his refusal will prevent disorder, there is a suppression of the right. *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 516. But prohibition by legislative act of abusive speech under circumstances which the legislature may appropriately believe dangerous to public order, and the punishment of speech unnecessary to the full exercise of the right, is believed to be no restraint, or at most a permissible restraint.

The power and the duty of the State to preserve the peace seems not to be doubted. If, as in *Thornhill* v. *Alabama*, 310 U. S. 88, no clear and present danger of a breach of the peace is inherent in the activity of every person who approaches premises "on strike" for the purpose of publicizing the facts of the labor dispute, and a statute prohibiting picketing for the purpose of such publicizing is invalid because not addressed to abuses, the statute now under consideration is not of that sort. It aims at abuses. It evidences some care in balancing community order with the right of free discussion of matters of public concern.

Nor is our statute of the sort declared unconstitutional in *Cant-*

*well* v. *Connecticut*, 310 U. S. 296. There the asserted offense was the soliciting of funds for religious purposes (by the sale of literature) without a permit. With the consent of two Roman Catholics in the street, the defendant played a phonograph record which turned out to be a criticism of the hearers' religion. The hearers were incensed. A breach of the peace might have occurred unless the defendant had withdrawn at request. "There was no evidence that he [the defendant] was personally offensive or entered into any argument with those he interviewed." The state court held that the charge was "not assault or breach of the peace or threats on Cantwell's part, but invoking or inciting others to breach of the peace, and that the facts supported the conviction of that offense." It resulted that the case involved the right to express opinion without the informant doing a single act of violence, without committing a breach of the peace, without either threat or offensive remark.

Mr. Justice *Roberts* pointed out (at *pp.* 303, 304, 307) that freedom to believe and freedom to act are both secured by the due process clause of the Fourteenth Amendment. "The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." While the state may not wholly deny the right to disseminate views which may inviolably be held, it may by general and non-discriminatory legislation regulate the times and places and the manner of conduct of the disseminator upon the streets, "and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment." The test suggested was whether the alleged protection of the State's interest has been pressed "to a point where it has come into fatal collision with the overriding interest protected by the federal compact." So tested, the Connecticut statute, which left to the licensing officer the decision whether a cause was religious or not, was declared unconstitutional as involving previous restraint by way of censorship and not directed at the conduct of the disseminator of opinions.

In the course of discussion, Mr. Justice *Roberts* remarked (at *pp.* 308, 309) upon permissible restraints of conduct. "The offense known as breach of the peace embraces . . . not only violent acts but acts and words likely to produce violence in others. . . . When . . . immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." Such a breach of the peace by Cantwell, the state court had held, did not exist. "One may, however, be guilty of the offense if he commit acts or make state-

ments likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument [the Federal Constitution]."

In our opinion the statute under which Chaplinsky was convicted of a breach of the peace is not rendered invalid by the fact that it placed his conduct under such restraint as it did, and provided a penalty for it. *Milk Wagon Drivers Union* v. *Meadowmoor Dairies*, United States Supreme Court, Oct. Term 1940, No. 1.

The defendant further says that our statute is invalid because it is so vague and indefinite that one coming within its purview may not know what is prohibited. In this connection, the claim is made that the test of what is offensive is purely subjective in the sense that it is to be determined by the way the addressee reacts to it. The defendant therefore argues that nobody can know what is offensive language, since one man may be offended by words to which another man would take no exception. We have never construed the statute by any such test. The word "offensive" is not to be defined in terms of what a particular addressee thinks. The legislature had no such vague, shifting test in mind. As was long ago said, they had in mind the tendency of words, not their actual result. The analogy was that of the distinction between civil and criminal libel. *State* v. *Brown*, 68 N. H. 200.

The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight. We have never applied the statute otherwise. The English language has a number of words and expressions which by general consent are "fighting words" when said without a disarming smile. In common understanding they are offensive in the Websterian sense of being such as to cause resentment, or, as Funk and Wagnalls say perhaps more aptly, adapted to give offense, offense being that which causes anger. Such words, as ordinary men know, are likely to cause a fight. So are threatening, profane or obscene revilings. Derisive and annoying words can be taken as coming within the purview of the statute as heretofore interpreted only when they have this

characteristic of plainly tending to excite the addressee to a breach of the peace. If the time may ever come when the words "damned Fascist" will cease to be generally regarded as "fighting words" when applied face-to-face to an average American, this is not the time. The Presiding Justice might have been warranted in telling the jury that they were offensive as a matter of law. But since he thought the jury as competent as he to understand the words, he left the question to them.

The statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker—including "classical fighting words," words in current use less "classical" but equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats. Men of common intelligence, situated as was Chaplinsky, do not need to guess at its meaning or differ as to its application. See *Connally* v. *Company*, 269 U. S. 385, 391. If the defendant or others might have guessed that less than such words were prohibited, or if they might have differed about what other words, if any, came under the ban, it was open to all to know, as we have heretofore held, that it could not apply except to words likely to cause a breach of the peace when addressed to an individual in a public place. Within the ambit of the statute, one does not need to guess at what is prohibited, for all men of common intelligence know almost instinctively what are the dangerous words when so addressed.

The holding of this statute as sufficiently definite is believed to be consistent with the decisions in *Stromberg* v. *California*, 283 U. S. 359, 369 (where the construction given included in the prohibition a fair use of constitutional freedom), in *Herndon* v. *Lowry*, 301 U. S. 242 (where defendants were obliged to exercise the gift of prophecy in order to know the application of the statute), in *Lanzetta* v. *New Jersey*, 306 U. S. 451 (where the defendant did not have the benefit of a permissible construction prior to the act with which he was charged), and in *Thornhill* v. *Alabama*, 310 U. S. 88 (where the prohibition extended to the use of words "without annoyance or threat of any kind").

The words "offensive," "derisive" and "annoying," in this connotation of tendency to disorder in public places, are commonly used and commonly understood. They are not wanting in meaning. Some are used in statements of legal principles by those who are careful of accuracy and definiteness of statement, as for example,

"personally offensive" language, "profane, indecent or abusive remarks directed to the person of the hearer," and "epithets or personal abuse," all of which are caught up in the phrase "words likely to produce violence in others." *Cantwell* v. *Connecticut, supra.* Though general in a sense, such words have commonly accepted popular and legal significance. When one speaks of publicizing "without annoyance or threat of any kind" (*Thornhill* v. *Alabama, supra*) he is not to be misunderstood, even though "without just or legal excuse" are words without ascertainable meaning. And so reference to an injunction prohibiting officials from interfering with the right of speakers "in an orderly and peaceable manner" is definite, because everybody understands what "orderly and peaceable" means. *Hague* v. *C. I. O.*, 307 U. S. 496, 517. Likewise, any intelligent person may understand the prohibition of our statute as it has always been construed. Equally clear is the phrase "matter obscene or offensive to public morals," or the phrase "disorderly conduct" (*Lovell* v. *Griffin*, 303 U. S. 444).

Finally, no person situated as was Chaplinsky, is left in any forbidden sense to guess what a jury will guess. Neither he nor the jury is faced with uncertainty in any other sense than would be the case if the charge were negligent conduct, where the test is that of average conduct or gross negligence. Our statute deals "with the actual, not with an imaginary condition other than the facts." *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 223. And it deals with those facts upon the basis of tendencies of words used face-to-face in public places which are matters of common knowledge and appreciation.

*Exceptions overruled.*

All concurred.