City of Cincinnati, Appellee, *v.* Karlan, Appellant.

[Cite as Cincinnati v. Karlan (1973), 35 Ohio St. 2d 34.]

(No. 72-842—Decided June 27, 1973.)

*Mr. Thomas A. Luebbers,* city solicitor, *Mr. Ralph E. Cors* and *Mr. John S. Moraites* and *Miss Dolores Hildebrandt,* for appellee.
*Mr. Andrew B. Dennison,* for appellant.

HERBERT, J. At the trial of this cause, the arresting officer testified upon direct examination as follows:

"Q. Directing your attention to that date, did you have occasion to come in contact with the defendant, Steve Karlan?

"A. Yes, sir; I did.

"Q. Tell the jury on what date and what time you first came in contact with him,

"A. It was January the 19th, this year, at about 5:05 p. m.

"Q. Where did you see him?

"A. In the rear lot of District 3's police station.

"Q. Where is District 3 located?

"A. 3201 Warsaw Avenue.

"Q. Is that in Cincinnati, Hamilton County, state of Ohio?

"A. Yes, sir; it is.

"Q. Prior to January the 19th, did you have any contact with the defendant?

"A. No, sir; I didn't.

"Q. Had you ever seen him before?

"A. No, sir.

"Q. Your first contact was January 19th, at 5:00 o'-clock p. m., at District 3?

"A. Yes, sir.

"Q. When you arrived at the District on that date, what called your attention to the defendant?

"A. The defendant was tampering with an automobile parked on the police lot.

"Mr. Dennison [defense counsel]: I am going to have to object to the word 'tampering.'

"The Court: Sustained as to the word, 'tampering.' Just describe what you saw with regards to this car.

"A. (continued) He was doing something with the automobile parked on District 3's lot.

"Q. Was he in the front of the car or in the back?

"A. In front of it.

"Q. Was he looking under the hood or on top of the car?

"A. He had the hood up.

"Q. Were his arms inside of the car?

"A. I don't remember.

"Q. Did you see him remove anything from the car?

"A. No, sir.

"Q. Did you see him with anything in his hands, at any time, that afternoon?

"A. Yes, sir,

"Q. What time did you see this?

"A. After I got out of my automobile. He had a radiator in his hands, an automobile radiator.

"Q. Can you recall where he had obtained the radiator?

"A. No, I don't know where he obtained it.

"Q. After you saw him with the radiator, did you approach the defendant?

"A. Yes, sir; I did.

"Q. What was your reason for walking up towards the defendant?

"A. We've had several things taken from automobiles impounded at District 3's lot, and anyone who takes a car, or part of a vehicle from that lot, has to have a release from the district station to take anything from the car or the vehicle, itself.

"Q. How much time, at this point, had lapsed from the time you pulled up to the District until you first walked up and had the conversation with the defendant?

"A. A couple of minutes, I guess.

"Q. Was any one with you when you pulled into the lot?

"A. Yes, there was.

"Q. Who was with you?

"A. Patrolman Norman Stewart.

"Q. Is he your partner?

"A. He was my partner that date.

"Q. When you got out of your car, what did Patrolman Stewart do?

"A. When we pulled in, we moved to the left of the parking space and Patrolman Stewart went into the garage area and I went to the rear lot.

"* * *

"Q. Were there any other vehicles in the parking lot at the time?

"A. Yes, sir; there was.

"Q. Were there police cruisers or other cars?

"A. There were both. There were other cars and police cars.

"Q. Were there other impounded cars on the lot? Do you know?

"A. The only cars that are allowed on the lot are city vehicles and the impounding lot.

"Q. Were you and your partner in full uniform at the time?

"A. Yes, sir.

"Q. Were you operating the police cruiser or was your partner operating the police cruiser?

"A. I don't remember who was driving that day, but we were in a police car, a marked police car.

"Q. Was any one else out in the lot?

"A. No, sir.

"Q. Did you see any one, any time, during the conversation that you had with the defendant?

"A. I did not.

"Q. As you approached the defendant, who spoke first?

"A. The defendant did.

"Q. What did he say to you?

"A. He asked me what I was looking at.

"Q. What was your response?

"A. I asked him if he had permission to tamper with this car.

"Q. What was his response to that?

"A. He said, 'I hate all of you fucking cops.'

"Q. Did he appear to be angry at this time?

"A. He appeared to be wild.

"Q. Tell the jury what he was wearing at the time. How was he dressed?

"A. He was wearing slacks and a jacket. I don't remember the color.

"Q. He wasn't in a coat and a tie?

"A. No, sir; he was not.

"Q. You say he appeared wild. When he had conversation with you, was this normal conversation, or was he shouting?

"A. He was shouting.

"Q. Demonstrate to the jury, repeating the conversation, the initial conversation, demonstrate exactly how

loud he said it to you. Just shout it out the way he shouted it out.

"A. (Demonstrating) He said, 'I hate all you fucking cops.'

"Q. After he said that to you, what did you do?

"A. I said, 'Wait a minute.' I said, 'Do you have permission to fool with this automobile?'

"Q. What did he say at this point?

"A. He said, 'Get out of my way you fucking, prick-ass cops.'

"Q. What was your response to this?

"A. At this time I stopped him from going to the car and I warned him about his language.

"Q. Then, what did he say?

"A. He called me a 'prick-ass cop', again.

"Q. Now this was the second time?

"A. This was the third time.

"Q. Then what did you do?

"A. Then I told him, I warned him again, and he called me a 'prick-assed' cop again.

"Q. Did you tell him that if he said it again you were going to arrest him?

"A. The fourth time—Before the fourth time, I put him under arrest.

"Q. What happened immediately after you placed him under arrest?

"A. I just took him by the arm and started leading him to the District.

"Q. Did he have any other conversation with you at this point?

"A. He just told me I couldn't do it."

Section 901-d4, Cincinnati Municipal Code, reads as follows:

"It shall be unlawful for any person to willfully conduct himself or herself in a noisy, boisterous, rude, insulting or other disorderly manner, with the intent to abuse or annoy any person * * *."

As construed by this court, the above ordinance has

40

recently been held not to prohibit the lawful exercise of any constitutional right or the lawful enjoyment of any constitutionally protected freedom. *Cincinnati* v. *Hoffman* (1972), 31 Ohio St. 2d 163, 285 N. E. 2d 714, certiorari denied — U. S. —, 35 L. Ed. 2d 583.[1]

However, appellant contends that *Hoffman* involved conduct and the case at bar concerns only speech. Thus, he reasons, the two causes are distinguishable and the ordinance is constitutionally defective under the facts at bar. To reach this conclusion, appellant is driven to categorize the language he employed as being constitutionally protected freedom of expression. To gain that harbor of refuge, he necessarily assumes that the abuse he chose to heap upon the police officer cannot be defined as ''fighting words.'' At this juncture, the persuasiveness of appellant's advocacy wanes perceptibly.

The doctrine of ''fighting words'' has its roots in *Cantwell* v. *Connecticut* (1940), 310 U. S. 296. There, the defendants were attempting to influence others to adopt a particular religious philosophy. Unfortunately, their efforts included the playing of a phonograph record which was highly insulting to another religious group. Two members of the latter faith were incensed by the record and the defendants were arrested. In reversing the convictions, Mr. Justice Roberts noted, at page 309:

''One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitu-

---

[1] The word "of," as it appears the second time in the second paragraph of the syllabus in *Hoffman*, is a printer's error. The word should be "or."

tion, and its punishment as a criminal act would raise no question under that instrument."

Two years later, in *Chaplinsky* v. *New Hampshire* (1942), 315 U. S. 568, Mr. Justice Murphy alluded to the term "fighting words." Interestingly, this case involved the same religious sect as did *Cantwell, supra.* Defendant Chaplinsky was enthusiatically dispensing his belief that all religion was a "racket," and doing so upon a public sidewalk. The assembled listeners began "getting restless" and a traffic officer thereupon escorted Chaplinsky toward the police station. As they neared city hall, the town marshal met them and the defendant proceeded to indulge himself in some epithets of questionable taste. He referred to the marshal as a "racketeer," a "damned fascist," and to the entire government of the city of Rochester as "fascists or agents of fascists." His conviction for the outburst was upheld by the Supreme Court, and in the opinion, at page 571, it is observed:

"Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

Recently, the defendant in *Cohen* v. *California* (1971), 403 U. S. 15, expressed his disenchantment with our government's late policy of compulsory military service by wearing a jacket, across the back of which was inscribed, "Fuck The Draft." He was arrested while wearing the jacket in

a public building in the presence of women and children. In writing the majority opinion reversing Cohen's conviction, Mr. Justice Harlan observed, at page 20:

"This court has also held that the states are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction. * * * [Citing *Chaplinsky* v. *New Hampshire, supra.*] While the four-letter word displayed by Cohen in relation to the draft is not uncommonly employed in a personally provocative fashion, in this instance it was clearly not 'directed to the person of the hearer.' * * * [Citing *Cantwell* v. *Connecticut, supra.*] No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult.'"[2]

It is obvious to us that the epithets shouted by the instant appellant were unmistakably in the "fighting" category.[3] Even recalling that in 1941 Fascism was considered among the ultimate of evils, it is difficult to imagine more inflammatory and personally abusive insults than those emitted by the appellant at bar. This is particularly so when the circumstances surrounding their utterance are considered.

Appellant nevertheless maintains that the officer's own testimony establishes his failure to be moved to anger or violence, though his face did become flushed. Hence, runs appellant's theory, these were not fighting words to this particular individual and the speech was constitutionally protected. We disagree with this reasoning.

Perusal of United States Supreme Court cases permits the conclusion that the high court has adopted an objective test for determining the "fighting" nature of words. In

[2]See, also, *Gooding* v. *Wilson* (1972), 405 U. S. 518.

[3]For this reason, we need not explore the theory that appellant's conduct was central to the facts of this cause, the speech being only ancillary thereto.

addition to the foregoing quote from *Cohen*, the opinion in *Chaplinsky* states, at page 574:

"Nor can we say that the application of the statute to the facts disclosed by the record substantially or unreasonably impinges upon the privilege of free speech. Argument is unnecessary to demonstrate that the appellations 'damned racketeer' and 'damned Fascist' are epithets likely to provoke the average person to retaliation, and thereby cause a breach of the peace."

To ignore that "average person" touchstone and select the subjective standard urged by appellant would only serve to exacerbate existing perplexities in this currently sensitive and tumultuous area of constitutional law.

Appellant's final proposition points to an error committed by the prosecutor in his cross-examination of the defendant and in his examination of a defense witness. Each of the two instances concerned whether or not the appellant had been "arrested" in the past because of his alleged involvement in an assault and battery.

The trial court erred in overruling the appellant's objections to those questions and the prosecutor should have been reprimanded for posing them. However, the error was harmless. We have examined the entire record of the proceedings below and can find no reasonable doubt of the appellant's guilt. *Chapman* v. *California* (1967), 386 U. S. 18. The evidence upon which the jury obviously based its conviction leaves no room for a finding that these two questions in any way served to deny appellant his fundamental right to a fair trial by an impartial tribunal.

In view of all the foregoing, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., CORRIGAN, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.