385 A.2d 642 (1978)
STATE
v.
Michael E. AUTHELET.
No. 76-219-Appeal.
Supreme Court of Rhode Island.
April 11, 1978.
*643 Julius C. Michaelson, Atty. Gen., Nancy Marks Rahmes, Sp. Asst. Atty. Gen., for plaintiff.
Aram K. Berberian, Cranston, for defendant.

OPINION
KELLEHER, Justice.
On September 3, 1974, at approximately 8:15 p. m. police Officer Peter F. Coutu was on a routine motor patrol in the city of Warwick when he received a radio message directing him to go to the intersection of Green River and West Shore Roads. The dispatcher's directive marked the third time during that tour of duty that Officer Coutu had been ordered to investigate a disturbance at this location. The police had once again received a complaint about the conduct of a group of "boisterous, drinking, swearing" young men who had gathered near a milk store and who, once they saw the police approaching, would flee into a nearby wooded area. As he began his third trip to the Green River-West Shore intersection, the officer decided a change of strategy was in order. Consequently, he headed for the woods rather than to the milk store. When the group saw the other cruisers proceeding along the highway, Authelet and three of his companions ran into the woods. There, to their surprise, was Officer Coutu. He arrested the quartet and charged each of them with violating G.L. 1956 (1969 Reenactment) § 11-11-5, which provides:
"Every person who shall be guilty of profane swearing and cursing shall be fined not exceeding five dollars ($5.00)."
At a jury-waived trial in the Superior Court, Officer Coutu testified that as he stood in the woods and watched his fellow officers approach the corner, he heard Authelet yell: "Here come the god damn fucking pigs again." The officer testified that the three companions were yelling at his fellow officers, but he could not recall any of the "swear words" used by the respective defendants. As a result of this testimony the trial justice acquitted Authelet's companions and found him guilty of violating the statute. Before us Authelet claims that the statute is void because its vagueness violates his constitutional right to due process, and he also asserts that the statute impinges upon his first amendment right of free speech.

I. Due Process

Nobody questions the fundamental principle which says that the state may not hold an individual "`criminally responsible for conduct which he could not reasonably understand to be proscribed.'" State v. Levitt, R.I., 371 A.2d 596, 598 (1977), quoting Rose v. Locke, 423 U.S. 48, 49, 96 S.Ct. 243, 244, 46 L.Ed.2d 185, 188 (1975), and United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. *644 808, 812, 98 L.Ed. 989, 996 (1954). This constitutional mandate is founded upon our system's concept of fairness. If a criminal act is set forth in a statute in uncertain terms, the innocent may be trapped by inadequate warning of what the state forbids. State v. Picillo, 105 R.I. 364, 252 A.2d 191 (1969). In addition, without explicit standards to guide those who administer the law, there is always the threat of arbitrary and discriminatory enforcement and the inhibiting of the exercise of basic freedoms. Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
The standard employed to gauge whether a particular statutory term reasonably informs an individual of the criminality of his conduct is whether the disputed verbiage provides adequate warning to a person of ordinary intelligence that his conduct is illegal by common understanding and practice. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); State v. Milne, 95 R.I. 315, 187 A.2d 136 (1962), appeal dismissed, 373 U.S. 542, 83 S.Ct. 1539, 10 L.Ed.2d 687 (1963).
We commence our "definiteness" appraisal by directing our initial focus to the question of whether the phrase "profane swearing and cursing" in and of itself lacks the clarity and specificity required of a statutory prohibition without regard to § 11-11-5's possible impingement upon Authelet's right to free speech. In testing whether a statutory term provides a defendant with fair warning of what the state forbids, we look to its common law meaning, its statutory history, and prior judicial interpretations. State v. Levitt, R.I., 371 A.2d at 598. Although the term "profane swearing and cursing" has never been judicially defined, the word "profane" has been interpreted in numerous instances by state and federal courts. These courts have invariably held the word to mean any words importing an imprecation of divine vengeance or implying divine condemnation or irreverence toward God or holy things. Duncan v. United States, 48 F.2d 128 (9th Cir. 1931); Baker v. State, 16 Ariz.App. 463, 494 P.2d 68 (1972); Cason v. Baskin, 155 Fla. 198, 20 So.2d 243 (1944); Centazzo v. Canna, 110 R.I. 507, 293 A.2d 904 (1972); Town of Torrington v. Taylor, 59 Wyo. 109, 137 P.2d 621 (1943).
In Karp v. Collins, 310 F.Supp. 627 (D.C. N.J.1970), rev'd on other grounds sub nom., Kugler v. Karp, 401 U.S. 930, 91 S.Ct. 933, 28 L.Ed.2d 210 (1971), the Court held that "profane" is a word which has by its frequent use and application established an understanding of its meaning definite enough to justify its use in a statutory provision. It has long been used without constitutional objection on vagueness grounds in the area of federal regulation of radio broadcasts, Tallman v. United States, 465 F.2d 282 (7th Cir. 1972); Duncan v. United States, 48 F.2d 128 (9th Cir. 1931), and has also been inferentially approved by the United States Supreme Court in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). In Chaplinsky the Court observed that there have always been certain classes of speech, such as profanity, the prevention and punishment of which, in appropriate circumstances, have never raised a constitutional problem. Although § 11-11-5 includes the element of "swearing and cursing" which was not present in the Duncan, Tallman, or Chaplinsky cases, we do not believe that the appendage of "swearing and cursing" changes the definition of "profane." "Swearing and cursing" is merely the act of speaking the forbidden words and does not qualify the type of language that is made criminal.
While we must grant that the term "profane swearing and cursing" is hardly a paragon of precision, we can hardly expect mathematical certainty from our language. Grayned v. City of Rockford, 408 U.S. at 110, 92 S.Ct. at 2300, 33 L.Ed.2d at 228-29. Consideration must be given to the latitude of the field and the consequent impracticability of rigid legislative criteria. State v. Milne, 95 R.I. at 323, 187 A.2d at 140. Surely, it would have been a near impossibility for the General Assembly to set forth in a statute a more specific definition of the proscribed language given the multitudinous *645 ways an individual can call down the divinity's condemnation upon his neighbor or inveigh holy things. As the Supreme Court observed in Rose v. Locke, 423 U.S. at 49, 96 S.Ct. at 244, 46 L.Ed.2d at 188, in upholding a Tennessee statute making it a crime for a person to commit "crimes against nature," the prohibition against excessively vague statutory language "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." We find, therefore, that given the commonly understood and established meaning of the word "profane" and its inclusion in criminal statutes by both state and federal legislatures, the use of the term in § 11-11-5 was a sufficient warning to protect defendant's due process rights.

II. Free Speech

When the state seeks to proscribe merely spoken words, as is the case with § 11-11-5, the United States Supreme Court has ruled that it may constitutionally do so only with "narrow specificity," NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963), in circumstances where the state can assert an overriding interest in prohibiting the type of speech concerned. Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). This constitutional principle is, of course, founded upon the first amendment prohibition against laws "abridging the freedom of speech"[1] and places "the decision as to what views shall be voiced largely into the hands of each of us * * * ." Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284, 293 (1971). As a consequence of the belief that the individual should be the judge of the ideas he wishes to communicate, there will arise the inevitable instances when this basic freedom will be employed to fill the air with verbal cacophony rather than the strains of reasoned discourse. However, to guard against the imposition of restraints on what or how a person chooses to express himself, the state cannot prohibit speech merely because the words offend, cause indignation, or anger the addressee. Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). The state must be able to assert some overriding interest in prohibiting the particular verbiage. Several types of speech which the Supreme Court has found that the state has such an interest in proscribing are: obscenity,[2] libel,[3] incitement,[4] and fighting words.[5]
The United States Supreme Court has never directly ruled upon whether profanity is a category of speech which, like the types of speech mentioned above, the state has a compelling interest to prohibit. In Chaplinsky the Court suggested that profane language might be a separate kind of unprotected speech like obscenity or fighting words. However, subsequent cases have not singled out profanity as a separable class of unprotected speech. The cases seem to place profanity in the category of "fighting words" as set forth in Chaplinsky. Thus, in Plummer v. City of Columbus, 414 U.S. 2, 94 S.Ct. 17, 38 L.Ed.2d 3 (1973), the Court struck down as vague and overbroad a city code provision which stated:
"No person shall abuse another by using menacing, insulting, slanderous, or profane language."
Without mentioning which forbidden act was the offending part of the code, the Court held the section "facially unconstitutional because not limited in application `to punish only unprotected speech' but is `susceptible *646 of application to protected expression.'" 414 U.S. at 2-3, 94 S.Ct. at 17, 38 L.Ed.2d at 5. The Court held the code section unconstitutional because the code proviso was not limited to fighting words.
Several courts have, however, determined that profanity may only be prohibited if it is considered within the category of fighting words. In Tallman v. United States, 465 F.2d 282 (7th Cir. 1972), the court held that unless the Chaplinsky test of fighting words was read into a statutory proscription against profanity, the statute would be unconstitutionally overbroad. Likewise, in Williams v. District of Columbia, 136 U.S. App.D.C. 56, 419 F.2d 638 (1969), the court reversed a conviction for the use of "profane language, indecent and obscene words." The court held that the only interests which the state could assert in forbidding profane or indecent language were those delineated in Chaplinsky. A third case, Conchito v. City of Tulsa, 521 P.2d 1384 (Okla.Crim.1974), ruled that a city ordinance proscribing "profane or obscene language" was unconstitutionally broad on the ground that it was not limited in accordance with the Supreme Court's previous rulings. The court implicitly found that profanity could only be constitutionally punished if the penal statute was restricted to the proscription of fighting words. Finally, in Reese v. State, 17 Md.App. 73, 299 A.2d 848 (1973), the court held that the statutory phrase "profanely cursing, [or] swearing" was meant to restrict only such language as came within the category of fighting words.
We subscribe to, the position taken by courts in Tallman, Williams, Conchito, and Reese, all supra. Although the Supreme Court has not specifically decided whether profanity may be independently proscribed, we feel that choosing to analyze profanity under the fighting words approach strikes the proper balance between the state's interest in maintaining order and an individual's right to free speech. While we do not condone the use of profanity in any context, neither can we countenance unwarranted state intrusions upon how a person comports or expresses himself. Of course, we would all perhaps wish that each person would conduct himself or herself in the most exemplary way possible, but failure to measure up to what society considers to be in good taste is not, and has never been, grounds for the imposition of criminal sanctions.
Section 11-11-5 is not, by its terms, limited to a situation in which the use of profanity rises to the level of fighting words. The statute places no limitation upon when the use of profanity is a crime. Only one element need be present to commit the offenseusing "profane swearing and cursing." The provision does not require anyone to be present when the words are spoken or, if present, to be offended by the language. Through the statute, the state punishes equally the person who by his vile tongue causes a violent confrontation to occur and "the hapless stonemason who, after crushing his toe, innocently utters a few relieving expletives." Williams v. District of Columbia, 136 U.S.App.D.C. at 62, 419 F.2d at 644. Thus, a penal statute barring the use of vulgar or offensive speech runs the risk of being unconstitutionally overbroad because of the sweep of its coverage. Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1972); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).[6]
*647 The state concedes that § 11-11-5 may be overbroad, but argues that we may construe the provision so as to render it constitutional and thereafter apply this construction to defendant's conduct. In pressing this contention, the state relies upon the established rule of statutory construction that when a statute is challenged on constitutional grounds, the court should construe the statute, if reasonably possible, so as to obviate any constitutional infirmity. J. M. Mills, Inc. v. Murphy, 116 R.I. 54, 352 A.2d 661 (1976); Murphy v. Director of Public Works, 103 R.I. 451, 238 A.2d 621 (1968).
We agree that if a reasonable construction of § 11-11-5 is available in order to save the constitutionality of the statute, it should be employed. In taking this course, we are guided by the reasoning of the court in Tallman v. United States, 465 F.2d 282. In Tallman the court noted that the word "profane" used in a criminal statute regulating radio broadcasts[7] was capable of an overbroad interpretation encompassing protected speech and would, without limitation, be unconstitutional, but went on to hold that "profane" could also be reasonably construed so as to preserve its constitutional validity. This could be, done simply by reading into "profane" the Chaplinsky test of "fighting words."[8]
We shall take the "fighting words" approach in construing § 11-11-5. As noted earlier, the Supreme Court first recognized the "fighting words" doctrine in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031. There the Court had before it a constitutional challenge to a New Hampshire statute which made it a crime to call another person who was lawfully on the street by any "offensive or derisive" name with the intent to annoy such a person or prevent him from carrying on his occupation. Chaplinsky had been distributing religious literature. He was arrested after he had called the city mar-shall a "God damned racketeer" and a "damned Fascist." In what has become the classic statement about what constitutes fighting words, the Court remarked: "`fighting' wordsthose which by their very utterance inflict injury or tend to incite an immediate breach of the peace." 315 U.S. at 572, 62 S.Ct. at 769, 86 L.Ed. at 1035. The Court made clear that these words were beyond the protective pale of the first amendment and could be excised from the airways of public discourse.
The Court's ruling, however, failed to articulate whether the words had to be directly addressed to someone. This doubt arose because the Supreme Court, in alluding to the restrictive view taken by the New Hampshire Supreme Court of its offensive-name-calling statute, referred to portions of State v. Chaplinsky, 91 N.H. 310, 312-13, 18 A.2d 754, 758 (1941), where the New Hampshire court at one point said that the statute had been applied only to those words that have a "`tendency * * * to provoke the person against whom it is directed, to acts of violence,'" and at a subsequent point remarked that the long-standing test to be used in determining the applicability of the statute was "what men of common intelligence would understand would be words likely to cause an average addressee to fight." 91 N.H. at 320, 18 A.2d at 762. The alternative references to the "person" to whom the remark is addressed and to the "average addressee" gave rise to this doubt. Interestingly enough, 35 years ago the United States Supreme Court was satisfied that the "average" person who was called a "damned racketeer" or "damned Fascist" would probably respond in a violent manner.
*648 The ambiguity has been resolved in later cases which provide that the only words which may be punished as fighting words are those that "`have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." Gooding v. Wilson, 405 U.S. at 524, 92 S.Ct. at 1107, 31 L.Ed.2d at 415; Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970). In Cohen v. California the defendant had been convicted of "disturb[ing] * * * the peace * * * by * * * offensive conduct." The evidence indicated that Cohen was arrested after he had been observed walking through a courthouse wearing a jacket bearing the inscription "Fuck the Draft." In reversing the conviction, the Court described fighting words as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." 403 U.S. at 20, 91 S.Ct. at 1785, 29 L.Ed.2d at 291. In order to be "personally abusive," the Court said, the words must be "directed to the person of the hearer." Since the message Cohen attempted to communicate was not directed to anyone in particular and there was no evidence that anyone who saw the message was provoked, the Court held that the jacket inscription did not constitute fighting words. While the Court thought Cohen's use of "Fuck" was vulgar, it emphasized that a penal statute could not be used "to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us" because "one man's vulgarity is another's lyric." 403 U.S. at 25, 91 S.Ct. at 1788, 29 L.Ed.2d at 294. This latter observation establishes that vulgar, profane, or offensive speech may not in and of itself be the cause of a criminal sanction.
Likewise, in Hess v. Indiana, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), the Court reversed a conviction for disorderly conduct arising from an antiwar demonstration. Hess and about 150 other demonstrators had moved their protest from a college campus to a public street where they proceeded to block traffic. Local authorities cleared the street, whereupon Hess shouted: "We'll take the fucking street later [or again]." The Supreme Court held that Hess' statement could not be fighting words since the undisputed evidence showed that it was not directed to any person or group in particular.
The progeny of Chaplinsky have also narrowed its formulation and application. In Chaplinsky the Supreme Court had defined fighting words as those either "inflict[ing] injury or tend[ing] to incite an immediate breach of the peace." 315 U.S. at 572, 62 S.Ct. at 769, 86 L.Ed. at 1035. Subsequent cases have discarded the "inflicting injury" facet of the Chaplinsky case. In Gooding v. Wilson, the Supreme Court reversed a conviction obtained under a Georgia statute which made it a crime to use "opprobrious words or abusive language tending to cause a breach of the peace." Wilson was arrested while taking part in an antiwar protest after telling the police: "White son of a bitch, I'll kill you. You son of a bitch, I'll choke you to death. You son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces." Without ruling upon whether Wilson's language constituted fighting words, the Court held that the conviction could not stand under the statute because the Georgia appellate courts failed to limit application of the statute to words creating an immediate threat of violent retaliation. The Court did not mention the Chaplinsky element of "inflicting injury." Thus, while the Court affirmed the proposition that fighting words are punishable, the Court so refined the application of the original doctrine that Mr. Justice Blackmun, in dissenting, remarked that the Court "is merely paying lip service to Chaplinsky." 405 U.S. at 537, 92 S.Ct. at 1113, 31 L.Ed.2d at 422.
The same limitation upon the Chaplinsky formulation of the fighting words doctrine was made in Cohen. There the Court defined fighting words so as to include only those words which are "inherently likely to provoke violent reaction." 403 U.S. at 20, 91 S.Ct. at 1785, 29 L.Ed.2d at 291.
*649 The Supreme Court's post-Chaplinsky rulings unequivocally establish that the words sought to be punished as fighting words must have a direct tendency to cause acts of violence by the person to whom the remarks are made. Fighting words are recognized as having some social value and are not to be punished on a "per se" basis but only when their use results in the likelihood of an imminent disturbance. Downs v. Maryland, 278 Md. 610, 366 A.2d 41 (1976).
Later cases have also clarified the standard to be used in judging whether language becomes prohibited fighting words. Thus, the Supreme Court has ruled that the words themselves must be "personally abusive epithets" and not merely the expression of unpopular views or a socially unacceptable mode of communication. Hess v. Indiana; Cohen v. California; Bachellar v. Maryland, all supra; Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). In Bachellar the defendants were carrying signs with antiwar slogans such as "Make Love not War," "Stop in the Name of Love," and "Why are We in Viet Nam." They were arrested, charged, and convicted of violating a state disorderly conduct statute. The Supreme Court reversed their convictions on the ground that the wording of the placards was not directed to a particular addressee nor was it personally abusive. Although the sentiments expressed by the defendants may have shocked certain individuals, the Court found that a reaction by the audience was attributable to the content of the ideas expressed and not their personally insulting quality.
Similarly, in Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), a conviction under a statute making it a crime to cast contempt upon an American flag by either words or act was overturned since the defendant's language could not be classified as fighting words. Angered because of the shooting of a civil rights leader, Street set fire to an American flag on a street corner and told the crowd, "We don't need no damn flag." The Court stated that "[t]hough it is conceivable that some listeners might have been moved to retaliate upon hearing [Street's] disrespectful words," the anger aroused in the listener was founded upon disagreement with the views expressed and not because the defendant was personally insulting. 394 U.S. at 592, 89 S.Ct. at 1365, 22 L.Ed.2d at 585. Unless there is personally abusive language which is likely to lead to imminent retaliation in a face-to-face encounter, words cannot be proscribed under Chaplinsky's fighting words approach.
The test of whether the words are personally abusive and inherently likely to provoke violent reaction may not rest on subjective perceptions, since an undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Commonwealth v. A Juvenile, 368 Mass. 580, 334 N.E.2d 617, 624 (1975). The test to be applied when the prosecution relies on the fighting words theory is an objective one: Are the defendant's expressions words which, when directed to the average person, would cause the addressee to fight? People ex rel. VanMeveren v. County Court, 551 P.2d 716 (Colo. 1976); Bousquet v. State, 261 Ark. 262, 548 S.W.2d 125 (1977); City of Cincinnati v. Karlan, 39 Ohio St.2d 107, 314 N.E.2d 162 (1974).[9] It is not necessary that the person who is personally insulted react violently. As long as the language is inherently likely to cause an average person to retaliate in a violent way, the defendant's words may be punished as fighting words.[10] Thus, as in *650 Bosquet and Karlan, even though a police officer may be expected not to react to abusive language, words directed to an officer which would cause an average person to fight may be proscribed.
Having construed § 11-11-5 so as to preserve its constitutionality, we have one issue remaining for our disposition. The state maintains that the narrowed statutory proscription can be applied to Authelet's language to uphold his conviction.
The Supreme Court has indicated that there is no constitutional objection to a state's applying a limiting construction of a statute to conduct occurring prior to the court's construction provided that the application affords the defendant fair warning. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Based upon this, the state would now have us hold that as a matter of law Authelet's crudity was unprotected "fighting words." Even if we assume that Authelet's message to his cohorts constitutes profanity under the statute, absolutely no evidence exists to suggest that the message was directed at Officer Coutu.
The defendant's appeal is sustained, the judgment of conviction is vacated, and the cause is remanded to the Superior Court with direction to enter a judgment of acquittal for the defendant.
PAOLINO, J., participated in the decision but retired prior to its announcement.
NOTES
[1] U.S.Const. amend. I.
[2] Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).
[3] New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
[4] Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).
[5] Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
[6] An alternative legal theory upon which the Supreme Court has relied in striking down speech-restricting statutes is the doctrine of vagueness. Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); see also The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L. Rev. 67 (1960), and The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 871-75 (1970). Regardless of whether the statute is categorized as either vague or overbroad, the evil inherent in the statute is the same. In purporting to criminalize protected expression, it "necessarily leaves all persons to guess just what the law really means to cover, and fear of a wrong guess inevitably leads people to forego the very rights the Constitution sought to protect above all others." Barenblatt v. United States, 360 U.S. 109, 137, 79 S.Ct. 1081, 1099, 3 L.Ed.2d 1115, 1135 (1959) (Black, J., dissenting).
[7] 18 U.S.C. § 1464 (1970) provides that it shall be a crime for any person to utter "obscene, indecent, or profane language by means of radio communication."
[8] It should be noted that a contrary result was reached in Conchito v. City of Tulsa, 521 P.2d 1384 (Okla.Crim.1974). The court refused to read into an ordinance punishing "profane or obscene language" the fighting words of Chaplinsky. However, one of the reasons for the court's holding was that to uphold the ordinance would cause a conflict between it and a state statute. General Laws 1956 (1969 Reenactment) § 11-11-5 presents no such dilemma.
[9] The original Ohio Appellate Court decision in City of Cincinnati v. Karlan, 35 Ohio St.2d 34, 298 N.E.2d 573 (1973), was vacated by the Supreme Court in 416 U.S. 924, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974). The Supreme Court requested the Ohio court to reconsider the defendant's conviction in light of the principles enumerated in City of New Orleans v. Lewis, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). After the Ohio court reviewed its initial decision and reaffirmed the conviction, 39 Ohio St.2d 107, 314 N.E.2d 162 (1974), the Supreme Court denied certiorari. 419 U.S. 1056, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974).
[10] A contrary position was taken in Hammond v. Adkisson, 536 F.2d 237 (8th Cir. 1976). The court held that the focus in determining whether the personally abusive words would cause an imminent breach of the peace was to be the subjective reaction of the addressee. Given the factual setting of the case, was this particular person likely to retaliate in a violent manner? The court derived this test by implication from Justice Powell's concurring opinion in Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), where he intimated that certain persons, like police officers may be required to exhibit a greater degree of restraint than the ordinary citizen.