[No. 8912-9-I. Division One. May 5, 1982.]

THE STATE OF WASHINGTON, *Respondent*, v. MARC D. MONTGOMERY, *Appellant*.

G. William Shaw, for appellant.

Norm Maleng, Prosecuting Attorney, and Howard K. Todd, Deputy, for respondent.

CALLOW, J.—Marc D. Montgomery appeals his juvenile court conviction for possession of marijuana, a misdemeanor. On February 6, 1980, two Seattle police officers were patrolling in downtown Seattle. Driving on 4th Avenue between Pike and Pine Streets about 10:50 p.m., the officers heard 15–year–old Marc Montgomery shout obscenities at them. The officers stopped their car, asked Montgomery what he had said, and he repeated his remarks. The testimony of one of the arresting officers is set forth, as pertinent, as it best describes the event:

DIRECT EXAMINATION
[Prosecuting Attorney]

Q Would you please state and spell your name?
A C. A. Ostolaza. Last name is O–S–T–O–L–A–Z–A.
Q What is your occupation?
A I'm a police officer for the city of Seattle.
Q How long have you been with the department?
A A little over a year.
Q Were you on duty the evening of February 6, 1980?
A I was.
Q On the evening of February 6, 1980, did you come into contact with Marc Montgomery?
A Yes, I did.
Q Is Marc Montgomery in the courtroom?
A Yes, he is. He's seated to my right.
Q Is that the person that's seated between you and the defense counsel?
A Yes, it is.
Q Where was it that you first noticed him?
A On the 1500 block of 4th Avenue.
Q What time of day was it?
A It was ten till 11 p.m.
Q Was anyone with you?
A My partner, Officer Sorenson.
Q What was—where was Marc Montgomery?
A He was on the east side of the street, on the sidewalk.
Q Where were you?
A I was in my patrol vehicle with my partner driving down 4th Avenue.
Q Which direction?
A Northbound.
Q The 1500 block is adjacent to what buildings?
A It's between Pike and Pine.
Q What drew your attention to Marc Montgomery?
A We were driving down and we had heard a loud screaming, "fucking pigs, fucking pig ass hole." That's what drew our attention to Mr. Montgomery.
Q Were your windows up or down?
A They were rolled up. It was cold out that night.
Q Could you tell who said this?
A Yes. We observed Mr. Montgomery say it.
Q Was Mr. Montgomery alone?
A No, he was not. He had another friend with him.
Q What did you do when you heard this?

A We backed our car up and then got out to see what the problem was.
Q Why did you do that?
A Well, he was being rather loud for that time of night. Downtown, people don't usually scream things.
Q Would you describe the contact that ensued?
A Well, my partner asked Mr. Montgomery what he had said.

. . .

Q What did Mr. Montgomery repeat?
A Fucking pigs.
Q What happened then?
A My partner, you know, asked him what the problem was, and he stated that he had received a drinking citation two days previously and that he wasn't very happy with the police at that point in time.
Q Were there other people about?
A Yeah. A crowd was starting to gather. Mr. Montgomery was quite loud and vocal in his statements.
Q How many people?
A There were about six or seven, somewhere around there.
Q What were they doing?
A Just standing around watching.
Q What happened next?

. . .

A We asked Mr. Montgomery to quiet down, which he did not do so we placed him under arrest for disorderly conduct.
Q What statements was he making?
A Oh, he was just going on about his displeasure with the Seattle Police Department.
Q How would you characterize his speech?
A Hostile and belligerent.
Q What words was he using?
A He was using, you know; namely, profanity such as: you know, fucking pigs and ass holes—words to that nature.
Q What attempts were made to calm him down?
A We told him to quiet down. His friend that was with him also told him to quiet down.
Q Did he respond to these suggestions?
A No, he did not. He said that he had the right to scream all that he wanted.

Q Why was he arrested?
A For creating a disturbance.
Q What effect were his actions having on the people around him?
A Well, there was a crowd of people standing by, blocking the sidewalk. Also, in that area the movie theaters aren't very far from around there—just up the block on Pike Street. Around 11 o'clock is when a lot of them let out.
Q Was the crowd reacting in anyway [sic] to what he was saying?
A They were just watching.
Q How did he react when he was placed under arrest?
A He told us we couldn't do that. He wasn't very happy about it. He continued to be verbal—loud, obnoxious.
Q What was done with him?
A He was placed in handcuffs. I did a pat down search where I came up with the pipe . . .

. . .

CROSS EXAMINATION
[Defense Counsel]
Q Officer, I have some [questions] for you. Marc yelled something at you as [you] drove by, right?
A Yes, he did.
Q He didn't threaten to hit you at all, did he?
A No.
Q He just expressed his displeasure with the Seattle police force?
A Yes.
Q You never had any contact with him before?
A No, I have not.
Q And the number of people that gathered to constitute the crowd that you referred to was six or seven, correct?
A Uh huh.
Q None of those people said anything outside to you, did they?
A No, other than Marc's companion.
Q Marc's companion is the only person that spoke to you or to Marc, correct?
A That's correct.
Q And Marc's companion was not behaving in a threatening manner, was he?
A No, he was not.

Q You folks were wearing uniforms that night, I assume?
A Yes.
Q And your partner, is that a male partner?
A Yes.
Q What is his physical description?
A About 6', 170 lbs.
Q And you are roughly?
A 5'5", 130 lbs.
Q And Marc is even shorter than you, right?
A He's right at 5'4".
Q And 120 lbs. maybe?
A Perhaps. I . . .
Q Just—but less . . .
A On the report it says that he's 5'4" and 115 lbs.
Q He wasn't obstructing traffic, correct?
A No, not at the time that we came across him.
Q You didn't fear for your safety in anyway [*sic*], right?
A No, I did not.
Q Didn't have reason to think that he had any weapon on him, did you?
A Down in that area, we always assume everybody has a weapon.
Q But there's nothing particular about Marc that made you think he had a weapon on him, right?
A Just in that area, sir, I assume everybody has one, juvenile or not.
Q You didn't think that any crime was being committed at the time, did you?
A Not that I was aware of.

. . .

REDIRECT EXAMINATION
[Prosecuting Attorney]
Q Officer Ostolaza, how long did this exchange take place?
A About five to ten minutes.
Q When you indicated that you thought no crime had taken place, what was the cause for the arrest?
A When we were speaking with Mr. Montgomery, he became bel*l*igerent and a crowd had gathered

. . .

Q Was that an offense?
A . . . and he wasn't going to be moving on. According to the Seattle City Code, if a sidewalk is blocked because of somebody's action, yes, it is an offense.

Q Was that the reason that you arrested him?
A Yes, it was.

Montgomery was charged in juvenile court with violation of the Uniform Controlled Substances Act and with obstructing a public officer. The prosecutor moved to amend the information to substitute disorderly conduct for the charge of obstructing a public officer. The motion was granted but a hearing on that count was continued until a later date. Montgomery was convicted of possession of marijuana. The prosecutor's office later dismissed the disorderly conduct charge due to insufficient evidence.

Montgomery first contends that his initial encounter with police was an unlawful detention. The primary issue is whether the police seized Montgomery. An investigatory stop may be made on less than probable cause, but the officers must still have a reasonable suspicion, based on objective facts, that the individual is involved in criminal conduct. *Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979); *State v. Thompson,* 93 Wn.2d 838, 613 P.2d 525 (1980). When police stop an individual and restrain his freedom, he has been seized and the detention must be reasonable under the Fourth Amendment. *United States v. Brignoni–Ponce,* 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975); *State v. Larson,* 93 Wn.2d 638, 611 P.2d 771 (1980).

■ Police–citizen encounters which occur under circumstances in which an individual is free to walk away do not amount to seizures, however, and may be initiated without a reasonable, articulable suspicion, much less probable cause. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *United States v. Wylie,* 569 F.2d 62 (D.C. Cir. 1977), *cert. denied,* 435 U.S. 944, 55 L. Ed. 2d 542, 98 S. Ct. 1527 (1978).

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry v. Ohio, supra* at 19 n.16. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Terry v. Ohio, supra* at 34 (White, J., concurring).

The initial encounter between Montgomery and the officers was nothing more than a police inquiry occasioned by Montgomery's comments to them. The evidence establishes that the police merely intended to inquire into the reason for Montgomery's loud talk and to request that he quiet down and move on. There is no evidence that the police restrained Montgomery's freedom until he refused to comply with their request. The initial encounter was not an unlawful detention.

■ Second, Montgomery asserts that the police did not have probable cause to arrest him for disorderly conduct. We agree. A warrantless arrest for a misdemeanor offense is not permitted unless the offense is committed in the police officer's presence. *Cerny v. Smith,* 84 Wn.2d 59, 524 P.2d 230 (1974). That a defendant is later formally charged with a different offense does not invalidate an otherwise lawful arrest. *Spokane v. Badeaux,* 20 Wn. App. 731, 581 P.2d 1088 (1978). The arresting officer must have probable cause to believe an offense has been or is being committed in his presence. *State v. Thompson, supra; Tacoma v. Harris,* 73 Wn.2d 123, 436 P.2d 770 (1968). The test for probable cause under such circumstances is stated as follows:

> "It is the well–established doctrine now throughout the United States that for a crime, which they have probable cause to believe is being committed in their presence, *though it be a misdemeanor,* duly authorized peace officers may make arrest without a warrant. The probable cause which will justify arrest for a misdemeanor without a warrant must be a judgment based on personal knowledge acquired at the time through the senses, or inferences properly to be drawn from the testimony of the senses."

*Sennett v. Zimmerman,* 50 Wn.2d 649, 651, 314 P.2d 414 (1957), quoting *Garske v. United States,* 1 F.2d 620 (8th Cir. 1924).

The record contains no citation to the municipal ordinance Montgomery allegedly violated, but tends to suggest that it was Seattle Municipal Code 12A.12.010, which provides:

12A.12.010 Disorderly conduct.

A. As used in this section "obstruct" means to render impassible [*sic*] and thereby subject passersby to unreasonable inconvenience or hazard.

B. A person is guilty of disorderly conduct if without lawful authority he knowingly:

1. Makes noise which unreasonably disturbs another; or

2. Unreasonably disrupts any lawful assembly or meeting of persons; or

3. Obstructs pedestrian or vehicular traffic; and refuses or intentionally fails to cease such activity when ordered to do so by a police officer or additionally in the case of subsection 2 by the person in charge of the assembly or meeting.

◼ The testimony shows that the defendant did not disrupt or obstruct pedestrian traffic himself nor does it show that the people who gathered at the scene were about to be incited to violence. While the defendant's foul language is an affront to most people, his language alone did not present a risk of harm to himself or others or cause any breach of the peace.

The language at issue has upon two occasions in Washington been afforded First Amendment protection under factual circumstances involving larger crowds and more explosive conditions than prevailed here. *Pasco v. Dixson*, 81 Wn.2d 510, 503 P.2d 76 (1972); *Kennewick v. Keller*, 11 Wn. App. 777, 525 P.2d 267 (1974). In *Pasco v. Dixson*, *supra* at 521, the court held:

The record is devoid of proof that this remark was made with design or intent to create a public disturbance or to offend other occupants of the park—except perhaps the police officers who testified they were not offended—or to disturb others in the quiet enjoyment of the park or that the remark would tend to produce any of such consequences, for no evidence was presented from which a

public disorder, disturbance or even commotion could be inferred . . . Nor does the record show the offensive language to have been used in such a loud, repetitious or persistent manner as to amount to a disorder in and of itself.[1]

Disorderly conduct ordinances have been limited to "fighting words," which are not afforded constitutional protection. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942). Fighting words are words whose very utterance inflict injury or tend to incite an immediate breach of the peace. *Gooding v. Wilson,* 405 U.S. 518, 31 L. Ed. 2d 408, 92 S. Ct. 1103 (1972).

As observed in *Chaplinsky v. New Hampshire* at page 573, fighting words are those words which

> have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed." . . . The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight. . . . Derisive and annoying words can be taken as coming within the purview of the statute as heretofore interpreted only when they have this characteristic of plainly *tending to excite the addressee to a breach of the peace.*

(Footnote omitted. Italics ours.)

Further, as stated by Justice Powell, concurring in *Lewis v. New Orleans,* 415 U.S. 130, 135, 39 L. Ed. 2d 214, 94 S. Ct. 970 (1974) (quoting *Lewis v. New Orleans,* 408 U.S. 913, 33 L. Ed. 2d 321, 92 S. Ct. 2499 (1972) (Powell, J., concurring)) (motion granted, case remanded to Louisiana Supreme Court for reconsideration):

> [W]ords may or may not be "fighting words," depending upon the circumstances of their utterance. . . . The words may well have conveyed anger and frustration

---

[1] Likewise, in *Pasco v. Dixson* at page 520, the court stated: "[t]o show a public disorder, actual or threatened, existing or impending, the uttered words must . . . be related to the circumstances in which they were uttered." The court reversed a conviction for disorderly conduct in that case, noting at page 521: "The record is devoid of proof that [an obscene comment] was made with design or intent to create a public disturbance or to offend other[s] . . . —except perhaps the police officers who testified they were not offended . . ."

without provoking a violent reaction from the officer. . . . [However] a properly trained officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words."

Our concern is for the right of all citizens to freely express themselves and the rule that applies to persons of all political beliefs, of all races and creeds and of all ages and positions in life, expressing themselves on any subject, must apply equally to an uncouth juvenile criticizing the police in the street. Justice Harlan speaking for the court in *Cohen v. California*, 403 U.S. 15, 25–26, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971) where the defendant had worn a jacket bearing the words "Fuck the Draft" into a county courthouse stated:

> Additionally, we cannot overlook the fact, because it is well illustrated by the episode involved here, that much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated. Indeed, as Mr. Justice Frankfurter has said, "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U. S. 665, 673–674 [88 L. Ed. 1525, 1531, 64 S. Ct. 1240] (1944).

> Finally, and in the same vein, we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from running the risk

of opening the door to such grave results.

Representative of the decisions of other states that have followed the command of the United States Supreme Court is *State v. John W.,* 418 A.2d 1097 (Me. 1980). In that case a juvenile verbally protested the arrest of his sister, berating the arresting officers with the same vulgar speech and obscenities that are in issue here. The police officer arrested the defendant brother for disorderly conduct. The court stated *inter alia:*

> A narrow judicial interpretation of criminal statutes affecting speech is necessary in order to insure that they prohibit only speech which is not constitutionally protected. *State v. Sondergaard,* Me., 316 A.2d 367, 369 (1974); *see also, Gooding v. Wilson,* 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972), and *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), both cited in [*State v. Hotham,* 307 A.2d 185, 186–87 (Me. 1973)]. As we said in *State v. White,* Me., 280 A.2d 810, 812 (1971): "The importance of this requirement becomes apparent when we consider that many forms of conduct and language, although distasteful to certain individuals or even a majority of people, are nevertheless afforded constitutional protection." *Accord, Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973). When dealing with fighting words there is a legitimate governmental interest in preventing words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace," but language which is merely distasteful cannot be punished. Application of a criminal statue [*sic*] must be restricted "to a kind of speech that produces or is likely to produce a clear and present danger of substantive evils that Maine constitutionally may seek to prevent." *State v. Porter,* Me., 384 A.2d 429, 432 (1978). *See also, F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919).[2]

---

[2] The court also noted that while the words are coarse and vulgar, they have become commonplace. We note that were the use of the invectives and vulgarisms

(Footnote omitted.) *John W.*, at 1101–02.

In *State v. Martin,* 532 P.2d 316 (Alaska 1975), a trooper of the Alaska state police had observed the defendant

---

used by the defendant to be held to be grounds for arrest, a number of professional tennis players and other public figures in sports and entertainment would be subject to arrest for their language, oft repeated. As further stated in *State v. John W.* at page 1104:

> The words used by John W. are certainly offensive, derisive or annoying words that taunted and insulted Officer Paul. The evidence was sufficient to support a finding that John was aware that it was practically certain that his conduct would cause Officer Paul to be taunted or insulted.

> We must, however, conclude that John W.'s conduct was not such as "would in fact have a direct tendency to cause a violent response by an ordinary person *in the situation of the person so . . . insulted or taunted.*" (Emphasis added.) Assuming without deciding that John W.'s conduct would have been sufficient if directed at some other person, we must look to the particular situation of the very person insulted or taunted. We do so to insure that our application of the statute will pass constitutional muster.

> In *Chaplinsky v. New Hampshire* [315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942)], the Supreme Court upheld a conviction under a New Hampshire disorderly conduct statute, based on a construction of the statute by the New Hampshire Supreme Court which limited its application to prohibit only

>> face to face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker. . . .

> 315 U.S. at 573, 62 S.Ct. at 770 *quoting from State v. Chaplinsky,* 91 N.H. 310, 319, 18 A.2d 754, 762 (1941). The emphasis in *Chaplinsky* was thus on the nature of the words spoken, not on the subjective response of the actual addressee. But while the test in *Chaplinsky* was objective, it was not wholly abstract; it did not make certain words punishable whenever and wherever they were used. On the contrary, the opinion plainly contemplated that courts enforcing disorderly conduct statutes must look to the actual situation in which the words were used, in order to punish only words which, when they were used, were "plainly likely" to cause a breach of the peace. The New Hampshire Court's opinion in *Chaplinsky,* quoted by the Supreme Court, noted that even classic fighting words are only fighting words "when said without a disarming smile." 315 U.S. at 573, 62 S.Ct. at 770, *quoting* 91 N.H. at 319, 18 A.2d at 762. It is clear 17-A M.R.S.A. § 501(2) requires that fact finders look to the specific context in which words were spoken. Fact finders need not look to the subjective response of the actual addressee, but they must consider the *situation* of that addressee. In particular, the fact finder must consider those personal attributes of the addressee which were reasonably apparent because those attributes are a part of the objective situation in which the conduct occurred. Thus, when John W. addressed a police officer who was assisting in the arrest of his sister, those facts must be considered part of the situation in which the juvenile's language must be evaluated.

operating his automobile in an erratic manner in downtown Fairbanks. The trooper requested the defendant to take sobriety tests, whereupon the defendant raised his voice in objection to the trooper, using loud and obscene language. The trooper then arrested the defendant for disorderly conduct.

The opinion quotes from *Coates v. Cincinnati,* 402 U.S. 611, 615–16, 29 L. Ed. 2d 214, 91 S. Ct. 1686 (1971) as follows:

> Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms. . . . The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be "annoying" to some people. If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good–faith enforcement of a prohibition against annoying conduct. And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is "annoying" because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens. (footnotes and citations omitted)

*Martin,* at 318–19.

The Alaska opinion narrowly construed its disorderly conduct statute consistent with the directives of the United States Supreme Court and commented as follows:

> Where a first amendment right such as freedom of speech is involved, a heavy burden is placed on the state to show not only substantial impedance to the officer but also that the communication in question falls into the traditionally unprotected areas of "fighting words" or speech creating "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."[3]

---

[3]Citing *Terminiello v. Chicago,* 337 U.S. 1, 4, 93 L. Ed. 1131, 69 S. Ct. 894

(Footnotes omitted.) *Martin,* at 322.

Finally, in *White v. State,* 330 So. 2d 3 (Fla. 1976), another juvenile case, the defendant appeared at the local police station endeavoring to have his father released from jail on bail. When told that it would require some time to complete the booking procedure for his father and determine the amount of bond, the defendant went into a fit, screaming obscenities and calling the officers the same things that Marc Montgomery shouted in this case. The opinion held that vulgar words alone could not be a ground for arrest, stating:

> In determining the narrow line between constitutionally protected speech and that which is unprotected, it is imperative to consider the circumstances in which the words were uttered. *Bradshaw v. State,* 286 So.2d 4 (Fla. 1973). . . .
>
> . . . There, the public interest was in preventing a riot; in the instant case, the public interest was in preventing the disruption of the orderly administration of police business in the Perrine Substation.
>
> The statute must not be construed to limit the use of a socially impermissible word merely as a tool of communication. Such expressions are constitutionally protected. That is not to say, however, that the use of constitutionally protected words, when accompanied by aural, non-verbal acts which infringe upon the rights of others to pursue their normal, lawful activities, extends the constitutional protection to such nonverbal acts. The defendant cannot excuse his shouting and screaming to the extent that it "was affecting the entire station" upon the ground that he was using socially impermissible, but constitutionally protected words. The gravamen of his offense was not *words,* but the *acts* which accompanied his words.
>
> . . .
>
> We announce specifically that by our limited construction of the statute in question we do not rule out the possibility that some protected speech may provoke violent dissent. Indeed, that is what freedom of speech is about—the right vigorously to advance a minority opin-

(1949); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572–73, 86 L. Ed. 1031, 62 S. Ct. 766 (1942).

ion even though that opinion may anger others and arouse forceful disagreement. *Wiegand v. Seaver,* 504 F.2d 303 (5th Cir. 1974).

. . .

In sum, the words used by the defendant are protected even though they may not be acceptable in certain strata of society. It is the degree of loudness, and the circumstances in which they are uttered, which takes them out of the constitutionally protected area. Indeed, his conduct would have been equally disorderly had he merely recited "Mary Had a Little Lamb" in the same tone and under similar circumstances.

We hold that mere words, used as a tool of communication, are constitutionally protected. The protection fails only when 1) by the manner of their use, the words invade the right of others to pursue their lawful activities, or 2) by their very utterance, they inflict injury or tend to incite an immediate breach of the peace. Limited by this construction, we hold the statute constitutional.

*White v. State,* at 5–7.

We agree with the statement in *Kennewick v. Keller,* 11 Wn. App. 777, 788, 525 P.2d 267 (1974), wherein the same words were in issue:

This court does not by this decision intend to place its stamp of approval upon the words spoken by the defendant; to the contrary, defendant's profanity offends our sense of common decency and is abhorrent to the respect that should be given a law enforcement officer acting in good faith in the performance of his duties.

We find the behavior and language of the defendant reprehensible and disgraceful. He deserves censure and rebuke, and his conduct has degraded him in the eyes of society. However, the law requires that the individual's right to free expression take precedence over the interests of others to be undisturbed by crude language. The defendant's offensive language did not create probable cause to arrest him for disorderly conduct. The marijuana seized incident to that arrest must be suppressed. The judgment and sentence of the juvenile court is reversed.

JAMES, J., concurs.

ANDERSEN, C.J. (dissenting)—I dissent from that portion of the majority opinion which holds that the defendant's arrest was improper. I would affirm the defendant's conviction for possession of the controlled substance which was found on him after his arrest.

The defendant in this case leveled a gratuitous 5– to 10–minute barrage of screamed obscenities at Seattle police officers. This did not occur at midday in a family neighborhood, but at night in a downtown night life section of a large city where, as an officer testified, they must necessarily assume that every person, adult or juvenile, is armed. The defendant's belligerence and torrent of obscenities occurred before the arrest, not after it. The defendant was not in a private place but was on a public sidewalk within the hearing of numerous members of the public. He was not expressing political or religious beliefs but was expressing his hatred of the police and the world at large.

Despite the foregoing, the defendant was not placed under arrest until other people started to move toward the scene and the defendant refused to move on when requested by the officers that he do so. As the trial court stated in that connection:

> THE COURT: *And the facts here are that people were gathering; [the defendant] continued to yell, yelling obscenities. He was asked to quiet down. He didn't quiet down. It wasn't an unintentional act as far as he was concerned. He kept pursuing it, and the officers felt at that time that they had probable cause to make an arrest for disorderly conduct.*

(Italics mine.)

I fail to see that the "freedom of speech" contemplated by the First Amendment has anything whatsoever to do with this case. A person's constitutional right to "freedom of speech" does not give a person the right to scream "Fire!" in a crowded theater and did not give the defendant the right to do as he did here. As the United States Supreme Court held in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 570–72, 86 L. Ed. 1031, 62 S. Ct. 766 (1942):

It is now clear that "Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action."

and further:

Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Cantwell* v. *Connecticut,* 310 U. S. 296, 309–310 [84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940)].

(Footnotes omitted.)

The constitution of this state contains the following admonition:

*A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government.*

(Italics mine.) Const. art. 1, § 32. It is appropriate that we have recurrence to basics here.

"At common law, any act which disturbs or tends to disturb the public peace is a misdemeanor. By 'peace' is meant the tranquility enjoyed by citizens of a community where good order reigns among its members, this being the natu-

ral right of all persons in political society. It is that invisible sense of security which every man feels so necessary to his comfort, and for which all governments are instituted." (Footnotes omitted.) 4 C. Torcia, *Wharton on Criminal Law* § 521, at 173–74 (14th ed. 1981). "The utterance of abusive language, unaccompanied by a threat of violence, is not punishable at common law as a breach of the peace. However, the use of abusive language toward another in a public place, in the presence of others, has such a tendency to disturb the public peace as to be punishable." (Footnotes omitted.) 4 C. Torcia, *Wharton on Criminal Law* § 530, at 193 (14th ed. 1981). What occurred here was a breach of the peace and the officers had the right to make the arrest at the time they did. *See* Seattle Municipal Code 12A.12.010; RCW 9A.76.020(3); RCW 9A.84.030(1)(a) and (c); *Davis v. Burgess,* 54 Mich. 514, 20 N.W. 540 (1884).

It was the sworn duty of the police officers to keep the peace. If the confrontation with this loud, raging, obscene young man had escalated into a general melee or riot, the officers most assuredly would have been severely criticized for letting the situation get out of hand. Here they made a decision based on their experience and expertise as police officers and arrested the defendant, thus nipping in the bud what could have developed into a bad situation. As the courts have said many times and in many contexts, what may appear one way to a judge sitting in an upholstered chair may well appear quite differently to a trained police officer patrolling the streets at night and dealing with real people in real situations.[4]

I do not consider *Pasco v. Dixson,* 81 Wn.2d 510, 503 P.2d 76 (1972) and *Kennewick v. Keller,* 11 Wn. App. 777, 525 P.2d 267 (1974), which are cited by the majority, to be controlling. *Pasco* involved a disorderly conduct charge based on a single obscene word uttered *after* the arrest. *Kennewick* involved a disorderly conduct charge based on

---

[4]*See, e.g., State v. Cabigas,* 5 Wn. App. 183, 185, 486 P.2d 1139 (1971); *State v. Sinclair,* 11 Wn. App. 523, 531, 523 P.2d 1209 (1974).

the defendant's uttering an obscenity three times *after* he had been asked to accompany the officer to the police station (in effect an arrest). In the present case, however, the defendant's belligerence and shouted torrent of obscenities occurred before the arrest and were a cause of it; in addition, the arrest was not made until after a crowd had started to collect and the defendant refused to move on when asked to do so.

What is more, I see no need to decide this case on constitutional grounds at all. "We have consistently held that we will not pass on constitutional issues unless absolutely necessary to a determination of the appeal." *Ohnstad v. Tacoma,* 64 Wn.2d 904, 907, 395 P.2d 97 (1964). Accordingly, there is no demonstrable need to constitutionalize the right to use obscenity toward police officers as the majority opinion seems to do.

For the additional reasons which follow, the validity of the defendant's arrest for disorderly conduct should be upheld, notwithstanding the later dismissal of that charge by the city prosecutor. I would, therefore, not suppress as evidence the controlled substance found on his person and would affirm his conviction for possession of the controlled substance found on him after his arrest.

Directly in point, factually and legally, is the opinion in *Von Sleichter v. United States,* 472 F.2d 1244 (D.C. Cir.), *cert. denied,* 409 U.S. 1063, 34 L. Ed. 2d 517, 93 S. Ct. 555 (1972).

In *Von Sleichter,* a police officer patrolling his beat asked a question of the defendant in that case, in a public place, and the defendant responded with obscenities. The defendant was arrested for disorderly conduct, was found to have drugs in his possession and thereafter was convicted of unlawful possession of drugs.

In upholding the validity of the arrest, Judge Leventhal, writing for the majority of the United States Circuit Court of Appeals held as follows:

Appellant's words were in a context that is pertinent. We are not to be taken as suggesting that these words

would suffice for an arrest if uttered, to take the hypothetical case put in *Williams* [*Williams v. District of Columbia,* 419 F.2d 638, 136 U.S. App. D.C. 56 (D.C. Cir. 1969)], by a "hapless stonemason" who accidentally stubs his toe, and whose spontaneous profanity is patently devoid of any possible offense. But appellant's words were in response to an officer's civil inquiry, a request for cooperation that may lawfully and reasonably be directed to citizens at large without any charge of crime. It is one thing to say that a citizen's cooperation is a moral duty rather than a legal duty that can be compelled. It is quite another to contend that the Constitution provides an immunity from arrest for a person who chooses to manifest his unwillingness to cooperate with the shout of a four–letter expletive on a public street, within earshot of passers–by. His primary verbal target may have been the officer; but he cannot stake out a constitutional right to disregard shock on the passers–by.

(Footnote omitted.) *Von Sleichter v. United States,* 472 F.2d at 1247.

And further:

We reiterate that we are not deciding that defendant was guilty of disorderly conduct, a decision that would require a determination concerning community standards. The standard that governs arrest does not require proof enough to convict. The police officer's probable cause for arrest may stand even though the prosecutor needs additional evidence for the preliminary hearing or the trial.

We are aware that conventions and fashions in language change. But we do not think that it can be doubted that these words have at least some minimal shock quality—we would recognize that well enough if they were shouted in a courtroom, or even a court corridor—that is sufficient to allow a criminal proceeding to be begun. And that is what is involved in the validity of an arrest. Indeed, there *is* implicit recognition of such shock value in another of appellant's arguments—that cursing is a useful safety–valve for pent–up hostility; that there is a cathartic charge in using words with a shock value, which justifies the use of such language in the service of a broader public interest. Whatever therapeutic claims may be made for this safety–valve in the context of language

spoken solely to a policeman, or in private, we do not see it as establishing a license to shout shocking and offensive expressions on the public streets, without regard to public annoyance.

Anything is possible; it is possible that this policeman was an old–fashioned fuddy–duddy who was not aware that the shockers of yester–year are today's common idiom on the residential streets of Georgetown. But as *Bailey* [*Bailey v. United States*, 389 F.2d 305, 128 U.S. App. D.C. 354 (D.C. Cir. 1967)] and many other cases reiterate—over and over again—the question is, not what would be held at a trial on the merits, but what it was reasonable for the policeman to do in the circumstances. We must give some credit to the policeman for ability to assess the ordinary impact of the sights and sounds he hears, at least for the purposes of an initial determination on his part to make an arrest, and subject to whatever might be brought out on cross–examination or rebuttal at a preliminary hearing or trial. We are not prepared to lay down a rule that there is such a constitutional privilege to shout four–letter words on a public street that a policeman who explains that he had made an arrest for the shouting of such language within hearing of citizens on the street must be held to have failed to show probable cause. We think the record before us does not permit us to vitiate the arrest for disorderly conduct.

Affirmed.

(Footnotes omitted.) *Von Sleichter v. United States*, 472 F.2d at 1249.

I would affirm the conviction in the present case.