[No. 16985–8–I.   Division One.   October 27, 1986.]

THE CITY OF SEATTLE, *Petitioner*, v. JOHN O. J. EZE, *Respondent.*

*Douglas N. Jewett, City Attorney,* and *Betty Ngan, Assistant,* for petitioner.

*Marilyn Young Skoglund, Public Defender,* and *Robert Adelman, Deputy,* for respondent.

GROSSE, J.—The City of Seattle appeals a superior court order declaring a Seattle Municipal Code provision governing disorderly conduct on buses to be unconstitutionally vague.

In pertinent part, the ordinance in question reads as follows:

> A person is guilty of disorderly bus conduct if while on or in a transit coach of the METRO Transit System, and with knowledge that such conduct is prohibited, he or she:
> . . .
> (6) Unreasonably disturbs others by engaging in loud or raucous behavior.

Seattle Municipal Code 12A.12.040, currently codified as 12A.12.040(F).

The respondent transferred from one Metro bus to another. When he boarded the bus he and the driver immediately developed a misunderstanding as to whether he had shown the driver his transfer. The driver testified that the respondent did not present the transfer at the time he boarded or thereafter; respondent testified that he had his hands full of textbooks and asked for a moment to set them down to present the transfer to the driver. The driver testified that respondent went into a tirade, calling the driver all kinds of names; that he sat down in the seat

behind the driver's seat, continuing his tirade with gesticulations; that he then stood up between the driver and another passenger who was attempting to converse with the driver. At this point the bus driver testified that he informed respondent to have a seat because he was "standing up in the front of the coach and he was jeopardizing the safety of my passengers and he kept gesticulating and using threatening gestures toward me and standing over me so I finally told him, I said, sir, if you don't have a seat I won't be able to operate the coach." According to the driver, respondent continued to stand, continued to argue and went so far as to tell the driver he would "kick his butt." However, at no point did the driver testify that respondent's voice was loud in volume. Indeed, the gist of his testimony is that much of what respondent said to him was unintelligible.

The respondent's version of the incident is quite different. The respondent, who is from Nigeria and learned to speak English there, testified that when he boarded the bus he was unable to immediately show the driver his transfer because he was carrying three large textbooks that interfered with his ability to withdraw the transfer from his jacket pocket. The respondent states that when the driver asked him for his fare he asked the driver to wait a second so that he could show it to him, intending to put down his books and return to present the transfer. Respondent's testimony confirms that at this point the situation degenerated into a conflict. However, it is respondent's contention that it was the driver who immediately began the conflict by using obscenities and "racial words" making very rude statements that were antagonizing to him and "very racist." Respondent contends that even after he showed the driver his transfer the driver kept on with his insults. Respondent claims that he did not threaten the driver but rather "told him to quietly drive the bus and stop committing a nuisance scene on the bus."

The bus driver testified that upon respondent's refusal to sit down he contacted Metro dispatch by radio and

requested instructions. He was instructed to stop the coach and await the arrival of police officers, which he did. The police officers testified that when they arrived they requested the respondent to leave the bus and that when he refused after three requests they removed him forcibly. The officers further testified that the respondent resisted his removal by grabbing at objects in the bus. Outside the bus, after a further altercation ensued, respondent had to be handcuffed and forced into the patrol car. While respondent was initially charged with both disorderly conduct under Seattle Municipal Code 12A.12.040(6) and with attempting to prevent a peace officer from making a lawful arrest pursuant to Seattle Municipal Code 12A.16.050, he was convicted only on the disorderly conduct charge.

The trial court found the respondent guilty, holding his conduct unreasonable because it interfered with the other passengers on the bus and because it diverted the attention of the driver from the safe operation thereof.

In municipal court, the superior court, and now this court, the respondent has contended that the ordinance is vague, that it fails to give notice of illegal conduct, and that it fails to set forth ascertainable standards for enforcement. While the ruling of the Superior Court voided the statute for vagueness, and the City of Seattle assigned error only to that void for vagueness ruling, both the City and the respondent in their respective briefs address the question of the potential overbreadth of the statute as it pertains to constitutionally protected rights of free expression. We will discuss both doctrines.

We hold that the statute is not unconstitutionally vague on its face; that even if so, the respondent's conduct falls within the hard core of the statute's proscriptions; and that properly construed the statute is not overbroad on its face nor overbroad as applied to the respondent's conduct.

The scope and comparison of the doctrines of vagueness and overbreadth as applied to statutes which potentially encompass constitutionally protected rights of free expression has been widely discussed. Nevertheless, there exists

confusion between the doctrines and the criteria to be considered in applying the doctrines. This confusion results primarily from the fact that the vagueness doctrine does encompass concerns with overbreadth when applied in the First Amendment context. Justice Douglas's dissent in *Karlan v. Cincinnati*, 416 U.S. 924, 40 L. Ed. 2d 280, 94 S. Ct. 1922 (1974), is illustrative:

The "void for vagueness" doctrine is, of course, a due process concept implementing principles of fair warning and nondiscriminatory enforcement. Vague laws may trap those who desire to be law abiding by not providing fair notice of what is prohibited. *Papachristou* v. *City of Jacksonville*, 405 U. S. 156, 162 (1972); *United States* v. *Harriss*, 347 U. S. 612, 617 (1954). They also provide opportunity for arbitrary and discriminatory enforcement since those who apply the laws have no clear and explicit standards to guide them. *Coates* v. *City of Cincinnati*, 402 U. S. 611, 614 (1971); *Shuttlesworth* v. *Birmingham*, 382 U. S. 87, 90–91 (1965). Further, when a vague statute "'abut[s] upon sensitive areas of First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.'" *Grayned* v. *City of Rockford*, 408 U. S. 104, 109 (1972), quoting *Baggett* v. *Bullitt*, 377 U. S. 360, 372 (1964), and *Speiser* v. *Randall*, 357 U. S. 513, 526 (1958).

Overbreadth, on the other hand, "offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Zwickler* v. *Koota*, 389 U. S. 241, 250 (1967), quoting *NAACP* v. *Alabama*, 377 U. S. 288, 307 (1964). A vague statute may be overbroad if its uncertain boundaries leave open the possibility of punishment for protected conduct and thus lead citizens to avoid such protected activity in order to steer clear of the uncertain proscriptions. *Grayned* v. *City of Rockford, supra*, at 109; *Dombrowski* v. *Pfister*, 380 U. S. 479, 486 (1965). A statute is also overbroad, however, if, even though it is clear and precise, it prohibits constitutionally protected conduct. *Aptheker* v. *Secretary of State*, 378

U. S. 500, 508–509 (1964); *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960).

*Karlan,* at 924–25. *See also Hontz v. State,* 105 Wn.2d 302, 308, 714 P.2d 1176 (1986). Thus, in the First Amendment context the vagueness inquiry involves three aspects: the requirement of fair notice, the avoidance of arbitrary or discriminatory enforcement, and the concern that the free exercise of protected freedoms not be inadvertently inhibited.

▉ Apart from First Amendment implications, the ordinance is not unconstitutionally vague. In *Everett v. O'Brien,* 31 Wn. App. 319, 641 P.2d 714 (1982), this court held that an Everett ordinance which prohibited noise which "'unreasonably disturb[ed] or interfere[d] with the peace, comfort and repose of owners or possessors of real property'" gave adequate description of the proscribed conduct such that a person of ordinary understanding would be capable of determining when a noise fell within that proscription. *Everett v. O'Brien, supra* at 323. Loud and raucous behavior that unreasonably disturbs others as proscribed by the Seattle ordinance is more specific than the mere prohibition of noise that was the subject of *Everett v. O'Brien, supra.*

*Webster's Third New International Dictionary* 1339 (1981) defines loud as "marked by intensity or volume of sound . . . clamorous, insistent: noisy, vehement, emphatic . . . obtrusive or offensive in appearance . . ." *Webster's* also shows raucous as a synonym for loud but adds the connotation of a "harsh, grating tone, esp. of voice, often implying rowdiness". The definition of raucous is disagreeably harsh or strident or boisterously disorderly. The United States Supreme Court has held the words "loud and raucous," while abstract, convey "a sufficiently accurate concept of what is forbidden." *Kovacs v. Cooper,* 336 U.S. 77, 79, 93 L. Ed. 513, 69 S. Ct. 448 (1949). We believe the words of the ordinance sufficiently specific to provide adequate notice and to avoid impermissible delegation of basic policy matters to "policemen, judges, and juries for resolu-

tion on an *ad hoc* and subjective basis" by providing sufficiently explicit standards for those who enforce the ordinance. *Grayned v. Rockford,* 408 U.S. 104, 109, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972). *Cf. Bellevue v. Miller,* 85 Wn.2d 539, 545, 536 P.2d 603 (1975).

It is the First Amendment aspect of the vagueness inquiry that is the most troublesome. We must decide whether the language of the ordinance is "so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech". *Winters v. New York,* 333 U.S. 507, 509, 92 L. Ed. 840, 68 S. Ct. 665 (1948). This principle is restated in *Grayned v. Rockford, supra* at 109.[1] This aspect of the vagueness inquiry is akin to the analysis for overbreadth.

The permissible scope of the regulation of speech through disorderly conduct ordinances was thoroughly discussed by this court in *State v. Montgomery,* 31 Wn. App. 745, 644 P.2d 747 (1982). *Montgomery* involved a juvenile who shouted obscenities at Seattle police officers and refused to quiet down and move on when requested by them to do so. The *Montgomery* court reiterated the constitutional restriction on the application of disorderly conduct statutes in the context of the spoken word to "fighting words", those "whose very utterance inflict injury or tend to incite an immediate breach of the peace." *Montgomery,* at 754 (citing to *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942) and *Gooding v. Wilson,* 405 U.S. 518, 31 L. Ed. 2d 408, 92 S. Ct. 1103 (1972)).[2]

---

[1]A careful reading of *Grayned v. Rockford,* 408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972) discloses that the third aspect of the vagueness inquiry is really little more than a truncated approach to the traditional overbreadth analysis. Because in the present case both parties have briefed the overbreadth issue and because the respondent asserts the statute's overbreadth as an additional ground for sustaining the action of the superior court, we will approach the analysis in traditional terms.

[2]The court further recognized that the circumstances in which the words are

We do not here deal with a general disorderly conduct ordinance that purports to restrict utterances in public places. The distinguishing factor is that the ordinance in question here is specifically directed at disorderly conduct on buses. That focus permits this court to emboss upon the ordinance a construction which saves it from potential infirmities. Government may regulate the time, place, and manner of speech:

> Clearly, government has no power to restrict such activity because of its message. Our cases make equally clear, however, that reasonable "time, place and manner" regulations may be necessary to further significant governmental interests, and are permitted. For example, two parades cannot march on the same street simultaneously, and government may allow only one. *Cox* v. *New Hampshire,* 312 U. S. 569, 576 (1941). A demonstration or parade on a large street during rush hour might put an intolerable burden on the essential flow of traffic, and for that reason could be prohibited. *Cox* v. *Louisiana,* 379 U. S. [536, 554 (1965)]. If overamplified loudspeakers assault the citizenry, government may turn them down. *Kovacs*

uttered are critical in the analysis because of the necessity of showing public disorder that is actual or threatened. *State v. Montgomery,* 31 Wn. App. 745, 753, 644 P.2d 747 (1982) (citing to *Pasco v. Dixson,* 81 Wn.2d 510, 503 P.2d 76 (1972)). *See also Lewis v. New Orleans,* 415 U.S. 130, 135, 39 L. Ed. 2d 214, 94 S. Ct. 970 (1974) (Powell, J., concurring). The right of free expression encompasses not just the content of speech but the manner of its utterance as the manner in which words are used may well be as important to the content of the message as the words themselves. There is a limit, however, when the manner of utterance exceeds certain bounds. Communication can become an act which is subject to regulation.

In sum, the words used by the defendant are protected even though they may not be acceptable in certain strata of society. It is the degree of loudness, and the circumstances in which they are uttered, which takes them out of the constitutionally protected area. Indeed, his conduct would have been equally disorderly had he merely recited "Mary Had a Little Lamb" in the same tone and under similar circumstances.

We hold that mere words, used as a tool of communication, are constitutionally protected. The protection fails only when 1) by the manner of their use, the words invade the right of others to pursue their lawful activities, or 2) by their very utterance, they inflict injury or tend to incite an immediate breach of the peace. Limited by this construction, we hold the statute constitutional.

*White v. State,* 330 So. 2d 3, 7 (Fla. 1976).

v. *Cooper,* 336 U. S. 77 (1949); *Saia* v. *New York,* 334 U. S. 558, 562 (1948). Subject to such reasonable regulation, however, peaceful demonstrations in public places are protected by the First Amendment. Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment.

The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." Although a silent vigil may not unduly interfere with a public library, *Brown* v. *Louisiana,* 383 U. S. 131 (1966), making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest. Access to the "streets, sidewalks, parks, and other similar public places . . . for the purpose of exercising [First Amendment rights] cannot constitutionally be denied broadly. . . ." Free expression "must not, in the guise of regulation, be abridged or denied."

(Footnotes omitted.) *Grayned,* at 115–17. In sum, government may prevent the material and substantial disruption of its legitimate and significant interests by enacting reasonable regulations on the time, place and manner of speech, so long as those regulations have as their nexus the protection of the interest in question and are not so broad as to prohibit all forms of free expression.[3]

Recently in *Bering v. Share,* 106 Wn.2d 212, 721 P.2d 918 (1986), our Supreme Court was required to explore the

---

[3]In certain.contexts the scope of regulation may include prohibitions on content as well. *Compare Tinker v. Des Moines Indep. Comm'ty Sch. Dist.,* 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969) *with Bethel Sch. Dist. 403 v. Fraser,* __ U.S. __, 92 L. Ed. 2d 549, 106 S. Ct. 3159 (1986). And, Justice Douglas was of the opinion that there is no constitutional right to spread one's otherwise protected message (albeit commercial or political advertising) to the captive audience on a municipal transportation system. *Lehman v. Shaker Heights,* 418 U.S. 298, 41 L. Ed. 2d 770, 94 S. Ct. 2714 (1974) (Douglas, J., concurring).

scope of the government's authority in regulating free expression.

Nevertheless "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 69 L. Ed. 2d 298, 101 S. Ct. 2559 (1981). A state may impose reasonable time, place and manner restrictions upon all expression, whether written, oral or symbolized by conduct. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 82 L. Ed. 2d 221, 227, 104 S. Ct. 3065 (1984). Such restrictions are valid if they "are content–neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." [*United States v. Grace,* 461 U.S. 171, 177 (1983)] (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983)).

(Footnote omitted.) *Bering,* at 222.

■ The legitimacy of the government's interest in protecting the safety, comfort and convenience of passengers on its municipal transportation system is well established. *Public Utils. Comm'n v. Pollak,* 343 U.S. 451, 96 L. Ed. 1068, 72 S. Ct. 813 (1952). Indeed, the trial judge in this case upheld the application of this ordinance to the respondent essentially on the grounds that his conduct was unreasonable in the context of "the small community of passengers on the bus." In so doing, she recognized that while a bus is a public place it is nonetheless quite different from a street or a park, a distinction perhaps best articulated by Justice Douglas in his concurring opinion in *Lehman v. Shaker Heights,* 418 U.S. 298, 307, 41 L. Ed. 2d 770, 94 S. Ct. 2714 (1974).

In asking us to force the system to accept his message as a vindication of his constitutional rights, the petitioner overlooks the constitutional rights of the commuters. While petitioner clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it. In my view the right of the commuters to be free from forced intrusions on their privacy precludes the

city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience.

Buses are not recreational vehicles used for Sunday chautauquas as a public park might be used on holidays for such a purpose; they are a practical necessity for millions in our urban centers. I have already stated this view in my dissent in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 469 [(1952)], involving the challenge by some passengers to the practice of broadcasting radio programs over loudspeakers in buses and streetcars: "One who tunes in on an offensive program at home can turn it off or tune in another station, as he wishes. One who hears disquieting or unpleasant programs in public places, such as restaurants, can get up and leave. But the man on the streetcar has no choice but to sit and listen, or perhaps to sit and to try *not* to listen." There is no difference when the message is visual, not auricular. In each the viewer or listener is captive.

It is unnecessary to further belabor the significance of the governmental interest in maintaining the safety, comfort and convenience of passengers on a metropolitan transit system. The ordinance is content neutral and is not overbroad. It prohibits loud and raucous behavior that interferes with the safety, comfort, and convenience of bus passengers when informed by the operator of the effect of such conduct and that it is prohibited.

Neither do we think that the ordinance suffers from any infirmities as applied to the respondent's conduct in terms of the ordinance's specificity or lack thereof. The facts indicate that the respondent is in no position to complain. At the point where the dispute between him and the driver escalated to his standing beside the driver while the bus was in operation, he was specifically told by the driver to sit down as he was interfering with the operation of the coach. While he may have been speaking to the bus driver on a legitimate point, his mode and manner of speech fell within the definition of loud and raucous. Once specifically told that his conduct was interfering with the operation of the bus respondent could no longer be heard to complain of

uncertainty as to whether his conduct was prohibited or permitted. Indeed, we believe that respondent's conduct falls within the hard core of the conduct that the ordinance is designed to prohibit, *i.e.,* substantial interference with the safe operation of a bus, such that the ordinance is constitutional as to his conduct alone, regardless of its arguable vagueness in other contexts. *See State v. Zuanich,* 92 Wn.2d 61, 593 P.2d 1314 (1979).

In terms of the scope of the ordinance the record clearly discloses conduct which interfered with the safety and convenience of the passengers, if not their comfort. By his conduct respondent distracted the bus driver from his duties, the principal one being the safe operation of the vehicle. This act potentially jeopardized the safety of the passengers. In refusing to sit down when directed to do so respondent caused the driver's supervisors to direct that the bus be stopped to await the arrival of police. Certainly this caused no small inconvenience to the other passengers. The ordinance is not overbroad as applied to respondent.

We reverse the order of the Superior Court and reinstate the judgment of the Seattle Municipal Court which found respondent guilty of a violation of Seattle Municipal Code 12A.12.040.

WILLIAMS, J., and JOHNSEN, J. Pro Tem., concur.

Reconsideration denied December 16, 1986.

Review granted by Supreme Court March 4, 1987.